1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NETLIST, INC.,** | Case No.:  13-cv-5889 YGR |
| **Plaintiff,** | **ORDER DENYING REQUEST TO ENLARGE PAGE LIMITATIONS PURSUANT TO CIVIL LOCAL RULE 7-12.** |
| **v.** | |
| **SMART STORAGE SYSTEMS, INC., AND DIABLO TECHNOLOGIES, INC., *et al.*,** | |
| **Defendants.** | |

The request to enlarge page limitations is **DENIED**.  If necessary, the Court will request supplemental briefing.

The parties should not perceive this denial to encroach upon their advocacy.  Rather, brevity more often persuades.  *See* Julie A. Oseid, *The Power of Brevity: Adopt Abraham Lincoln's Habits,* 6 JOURNAL OF THE ASS'N LEGAL WRITING DIRECTORS 28 (2009), attached hereto.

This terminates Docket No. 261.

**IT IS SO ORDERED**.

Date: **October 3, 2014**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

# ATTACHMENT 1

6 J. Ass'n Legal Writing Directors 28

**Journal of the Association of Legal Writing Directors**
Fall, 2009

Article

THE POWER OF BREVITY: ADOPT ABRAHAM LINCOLN'S HABITS

Julie A. Oseid [a1]

Copyright © 2009 by the Association of Legal Writing Directors; Julie A. Oseid

**WESTLAW LAWPRAC INDEX**

**ADV -- Advocacy & Lawyering Skills**

Brevity persuades. Abraham Lincoln knew the power of brevity. Lincoln's eloquence was grounded in his ability to express much with few words. [1] He learned the persuasive power of brevity while practicing law. Lincoln's brevity in his Presidential speeches persuaded his audiences, and it continues to inspire and persuade us. Today, brevity is just as persuasive, and even more necessary. [2]

This short article [3] focuses on the use of brevity in legal brief writing. Part I defines "brevity." Part II focuses on the persuasive power of brevity in legal **\*29** writing. Part III reviews Lincoln's legal career, focusing in particular on his use of brevity. Part IV examines Lincoln's use of brevity to persuade as President by considering three speeches: the First Inaugural, the Gettysburg Address, and the Second Inaugural. Part V explores Lincoln's writing and editing habits, and it urges lawyers to adopt Lincoln's habits of writing early, visualizing audience, and ruthlessly editing. Lincoln worked hard for his eloquence and persuasiveness, and by adopting his habits we lawyers can also increase our eloquence and persuasiveness.

**I. "Brevity" is the Quality of Expressing Much with Few Words.**

Lincoln gave us a glimpse of his definition of brevity by describing what it was not. Lincoln made the following observation about another lawyer: "He can compress the most words into the smallest ideas of any man I ever met." [4] The opposite of that practice, the quality of expressing much with few words, [5] captures what this article means by brevity. This quality is what judges mean when they plead for brevity. They are beseeching the advocates, "Please, tell me exactly what I need to know to make the right decision, but not one single thing more."

Several other words make multiple appearances in "brevity" definitions, such as terse, succinct, concise, pithy, and brief. [6] The word "brevity," as opposed to these other terms, suggests the art involved in writing and editing. [7] Lawyers are professional writers. [8] Lawyers write legal briefs for professional readers. [9] Writing is the craft of our profession, and writing with brevity enhances our persuasiveness.

Brevity also encompasses more than simply using the shortest paragraphs, the least number of words, or words with single syllables. The goal of brevity should be clarity. Striving for brevity means the writer is seeking a delicate balance. The legal argument must not be obscured, either by **\*30** so many words that the heart of the argument is lost or by so few words that the argument omits critical assumptions or connections. [10] Lincoln scholar Ronald C. White Jr. notes, "The opposite of verbose is not simple. [Abraham] Lincoln was not bent on brevity

alone. He was intent on precision. Sometimes precision might mean more." [11] One example is telling. Lincoln's outstanding awareness of rhythm and sound resulted in the longer "Four score and seven years ago" instead of the shorter "Eighty-seven years ago" beginning of the Gettysburg Address. [12]

## II. Brevity Persuades in Legal Writing.

Not only do we lawyers know who reads our briefs, but those readers have repeatedly told us about their preference for brevity. Supreme Court Justice Antonin Scalia and Professor Bryan A. Garner emphasize the importance of brevity throughout their new book *Making Your Case: The Art of Persuading Judges*. [13] They offer compelling advice about the persuasive power of brevity:

[A] long and flabby brief, far from getting a judge to spend more time with your case, will probably have just the opposite effect.

Ponder this: Judges often associate the brevity of the brief with the quality of the lawyer. Many judges we've spoken with say that good lawyers often come in far below the page limits--and that bad lawyers almost never do. [14]

Judge Ruggero Aldisert from the Third Circuit Court of Appeals lists the criticisms expressed by judges about briefs: "Too long. Too long. Too long." [15] Ninth Circuit Judge Alex Kozinski expounds, "[W]hen judges see a lot of words they immediately think: LOSER, LOSER. You might as well write it in big bold letters on the cover of your brief." [16]

 **\*31**  In 2000, Kristen Robbins conducted a thorough study asking federal judges to rate the way lawyers write and to then indicate what they consider good legal writing. [17]  The results: "What judges really want is shorter, harder hitting briefs." [18]  Federal judges see brevity as absolutely essential to persuasiveness. [19]  Robbins explains, "When asked how important conciseness is to legal writing's persuasiveness, ninety percent of the judges said that conciseness is "essential" and "very important." [20]  A few of the judges' handwritten comments responding to a survey question about what law schools can do to improve persuasive writing are revealing:

•A brief can be brief. Please tell your students that I have a lot to do and little time to do it. Write a brief that I can adopt as my opinion with a straight face and you will please me.

•Brevity, brevity, brevity ....

•Remind the students that as they learned in English 101, clarity and brevity are virtues ....

•Conciseness! ...

•Excessive length may hurt your case.

•Encourage brevity and precision ....

•[A] judge has only a limited amount of time to devote to each case ... the good advocate must be sure that none of that time is wasted.

THE POWER OF BREVITY: ADOP A ABRAHAM..., 6 U. Mass'n Legal...

Case 4:13-cv-05889-YGR Document 264 Filed 10/03/14 Page 5 of 25

**\*32** If briefs are too long, the judge's attention will often stray and the good arguments will be lost in the sea of irrelevance. [21]

Lawyers are in the unique but valuable position of knowing exactly what our readers want. Those readers have made it abundantly clear that they value brevity. Lawyers will increase their persuasiveness by giving those readers exactly what they want.

### III. Lincoln as Lawyer--Learning the Value of Brevity.

Other writing professionals use brevity to persuade. One of the most poignant examples comes from literature. According to legend, friends bet Ernest Hemingway that he could not write a short story in six words. Supposedly, Hemingway returned the next day with his six-word masterpiece, "For sale: Baby shoes. Never used." [22]

Lincoln scholars point out that Lincoln could have had a very successful career as a professional writer. [23] This article focuses on our fellow lawyer Abraham Lincoln because he used brevity so effectively. [24] Picking one specific **\*33** quality of Lincoln's writing talent, his use of brevity, certainly does not mean this was his only literary skill. Lincoln used many rhetorical devices very effectively including alliteration, rhyme, repetition, contrast, balance, and metaphor. [25] Lincoln loved poetry from his childhood to the time of his death. [26] Both the Gettysburg Address and The Second Inaugural have been called prose poems. [27] In some ways it is not fair to choose just one quality, brevity, from Lincoln's speeches. Lincoln often chose to forego brevity in favor of another rhetorical device. Yet it would be disingenuous to turn a short article on brevity into a long treatise on all of Lincoln's literary skills. Brevity is the focus here because it is so critical for legal writers.

Lincoln's particular skill in persuading with brevity was honed during his days practicing law. [28] Lincoln spent twenty-five years practicing law before becoming President of the United States, but his legal career was initially ignored by historians. [29] This oversight is somewhat surprising because "no other president spent quite so much time inside a courtroom; and the law had never exercised quite so exclusive an influence over a chief executive." [30] One **\*34** notable exception was Benjamin P. Thomas, who wrote a 1952 biography of Lincoln. Mark Steiner explains,

Thomas was also one of the first biographers to describe how the lawyer influenced the president. Thomas, for example, concluded that Lincoln's presidential speeches and writings were a product of his legal training. In Lincoln's state papers, he "manifested that capacity to understand an opponent's point of view, and to present his own case clearly and simply, which he had so painstakingly acquired as a circuit lawyer." [31]

More is known today about Lincoln's legal practice than in any previous time. [32] Research into Lincoln's legal career has been greatly enhanced by the recently completed Lincoln Legal Papers project, which compiled all the available court records from Lincoln's state and federal cases. The researchers for the project went to eighty-eight Illinois counties, other states, and Washington, D.C. to study Lincoln's legal career, which lasted from 1836 to 1861. [33] As a result of this project, several new books about Lincoln the lawyer are available. [34]

Studying Lincoln's career as a lawyer raises several questions. Was he a masterful lawyer [35] or merely an average practitioner whose legal career would not be studied or found significant if he had never become President? [36] Did Lincoln have a special insight into the hearts and minds of people, [37] or did he practice law with an intentional

distance from both his clients and his colleagues? [38] Was Lincoln the lawyer a champion of freedom, a supporter of **35** slaveholders' rights, a frontier philosopher, a gifted student of human nature, or a practical lawyer who worked to reduce friction by resolving disputes? [39]

One fact is not contested: "Lincoln was a lawyer, and he thought and spoke like a lawyer." [40] He developed his writing and speaking style preferences during his legal career. [41] Lincoln used clear, simple language when arguing a case before a jury. [42] He avoided technical language but instead used a conversational tone. [43] Lincoln the lawyer used a common language to appeal to the average person. [44] He did not quibble over nonessential matters and was known to say he "reckoned" it was fair to allow a certain piece of evidence or admit the truth if he knew something was true. [45] Lincoln did not waste his arguments. He saved his words, and used just the necessary number of those words, for essential matters.

Lincoln's years spent practicing law "shaped his use of language at various points throughout his political career, giving him a high degree of clarity and a judicious use of words." [46] Lincoln's First Inaugural was delivered by Lincoln, the lawyer, making a case to the jury, the people of the North and South. [47] It might be entertaining to consider whether Lincoln would have turned out differently had he been a farmer or teacher, [48] but his skillful use of brevity was tied particularly to his choice to become a lawyer.

### *36  IV. Lincoln as President--Using the Power of Brevity.

Lincoln continued to use brevity's persuasive power when writing some of his great Presidential speeches. Lincoln wrote for the live audience who would listen to his speeches. [49] Yet Lincoln also wrote for the reader, knowing that his speeches would be transcribed in newspapers across the country. [50] The speed at which Lincoln's printed speeches spread across the country changed dramatically during his four years as President. The First Inaugural made its way to California via the Pony Express, [51] while The Second Inaugural traveled the day after it was delivered from New York to California via the just completed transcontinental telegraph line. [52] Lincoln valued both speaking and writing but believed that writing was "the supreme artifact of human genius." [53] Lincoln also praised printing for its ability to distribute the written word to thousands. [54] Throughout his life, Lincoln relied on newspapers for his own education. [55] While in his twenties, he often read newspapers out loud to others. [56] He learned himself by reading out loud, and he also believed that reading out loud "made him more retentive by giving him the sound as well as the sight of the words." [57] A complete understanding of Lincoln's eloquent use of brevity cannot be gleaned from analyzing only three speeches. [58] Still, a review of the First Inaugural, the Gettysburg Address, **37** and the Second Inaugural, gives us at least a glimpse into the importance of brevity in Lincoln's work.

### A. Editing for Brevity--The First Inaugural.

The First Inaugural, which was Lincoln's first speech as President, is an example of how Lincoln used brevity when editing. [59] Lincoln asked several people, including William H. Seward, who would become his Secretary of State, to read and comment on a draft of his First Inaugural. [60] Seward, who had a reputation as an excellent speaker, took his role as editor very seriously. [61] He made forty-nine suggestions, and Lincoln incorporated twenty-seven of those when rewriting the First Inaugural. [62]

THE POWER OF BREVITY: ADOPT ABRAHAM..., 60 Loy. L.A. L. Rev. ...

Case 4:13-cv-05889-YGR   Document 264   Filed 10/03/14   Page 7 of 25

The most fascinating changes to the First Inaugural occur in the way Lincoln handled Seward's suggestions for the Conclusion:

| SEWARD | LINCOLN |
| --- | --- |
| 1. I close. | I am loth [sic] to close. |
| 2. We are not, we must not be, aliens or enemies, but fellow-countrymen and brethren. | We are not enemies, but friends. We must not be enemies. |
| 3. Although passion has strained our bonds of affection too hardly, they must not, I am sure they will not, be broken. | Though passion may have strained, it must not break our bonds of affection. |
| 4. The mystic chords which, proceeding from so many battlefields and so many patriot graves, pass through all the hearts and all the hearths in all this broad continent of ours, will yet again harmonize in their ancient music when breathed upon by the guardian angel of the nation. | The mystic chords of memory, stretching from every battlefield, and patriot grave, to every living heart and hearthstone, all over this broad land, will yet swell the chorus of the Union, when again touched, as surely they will be, by the better angels of our nature. |

**\*38**  For three of the four suggested changes, Lincoln used a shorter version than Seward suggested. [63]  In the third sentence, he used thirteen words instead of Seward's suggested twenty-one words. He also eliminated redundant words by changing Seward's "aliens or enemies" to "enemies" and Seward's "fellow-countrymen and brethren" to "friends." [64]  In only one instance, the first suggested change, did Lincoln add words. He changed Seward's "I close" to "I am loth [sic] to close." This change is an example of Lincoln not choosing brevity over all other goals. White explains that "the result of expanding Seward's first sentence, 'I close,' to Lincoln's 'I am loth [sic] to close" was to achieve a pleasing assonance in bringing together "loth [sic]" and "close." [65]  Other scholars have noted that the additional three words improved the cadence, but also make "the sentence throb with connotative meanings and emotive force." [66]  The last sentence is admittedly long, but Lincoln needs all those words to convey his final thoughts about warmth and conciliation. Historian Douglas L. Wilson notes, "Thus stretched, the 'mystic chords of memory' become something like a musical instrument, capable of producing a harmonious music that will return us to our commonality .... This can occur  **\*39**  ... by the 'better angels' of our own natures." [67]  Lincoln biographer Fred Kaplan calls Lincoln's changes to Seward's suggested closing a transformation from "the adequate to the brilliant." [68]

In the First Inaugural, Lincoln used other legal skills. He argued his case, relied on his precedential political speeches, used logic and reason, and supported the Constitution. [69]  He also concluded the speech with brevity, which would become an even more key factor in the persuasive power of the Gettysburg Address and the Second Inaugural. Many historians consider these two "quite short" speeches as not only Lincoln's greatest, but the greatest speeches given by any President. [70]

*B. "Startlingly Brief for What It Accomplished"--The Gettysburg Address.* [71]

The Gettysburg Address summarized the Civil War in ten sentences and 272 words. [72]  It took President Lincoln, a slow speaker, [73]  between two and three minutes to deliver the speech. [74]

Historians often compare the brevity of Lincoln's speech favorably to Edward Everett's two-hour-long speech dedicating Gettysburg National Cemetery. [75]  Everett's speech is largely forgotten, but in fairness to Everett, the audience both expected and looked forward to a long address. [76]  Lincoln was not expected to make a long speech, yet even so the Gettysburg Address is "startlingly brief for what it accomplished." [77]

**\*40**  The Gettysburg Address, now engraved on a wall in the south chamber of the Lincoln Memorial, [78] reads: Four score and seven years ago our fathers brought forth on this continent, a new nation, conceived in Liberty, and dedicated to the proposition that all men are created equal.

Now we are engaged in a great civil war, testing whether that nation, or any nation so conceived and so dedicated, can long endure. We are met on a great battle-field of that war. We have come to dedicate a portion of that field, as a final resting place for those who here gave their lives that that nation might live. It is altogether fitting and proper that we should do this.

But, in a larger sense, we can not dedicate--we can not consecrate--we can not hallow--this ground. The brave men, living and dead, who struggled here, have consecrated it, far above our poor power to add or detract. The world will little note, nor long remember what we say here, but it can never forget what they did here. It is for us the living, rather, to be dedicated here to the unfinished work which they who fought here have thus far so nobly advanced. It is rather for us to be here dedicated to the great task remaining before us-- that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion--that we here highly resolve that these dead shall not have died in vain--that this nation, under God, shall have a new birth of freedom--and that government of the people, by the people, for the people, shall not perish from the earth. [79]

**\*41**  Of the 272 words, 206 are one syllable long. [80]  Lincoln used ordinary vocabulary to persuade his listening and reading audiences. [81]  These common and ordinary words gave "greater dignity" to the speech. [82]  Garry Wills calls The Gettysburg Address "a stunning verbal coup" and "an open-air sleight-of-hand" resulting in a new founding of the nation, with a resulting new interpretation of the Constitution. [83]  In these 272 words, Lincoln created a new Constitution based on its spirit instead of its words; one that valued equality and did not tolerate slavery. [84]

### C. "Grand Simplicity and Directness"--The Second Inaugural. [85]

Lincoln considered his Second Inaugural Address his finest speech. [86]  In a letter to Thurlow Weed, Lincoln commented, "I expect the latter [The Second Inaugural] to wear as well--perhaps better than anything I have produced." [87]

**\*42**  The Second Inaugural was expected to be short, after the Associated Press reported it would be "brief." [88]  The Second Inaugural Address was 701 words long. [89]  Lincoln delivered it in about six minutes. [90]  A total of 505 of the words are only one syllable long. [91]  Lincoln was concluding the speech even as people were still arriving to hear the Address. [92]

The Second Inaugural, now engraved on a wall in the north chamber of the Lincoln Memorial, [93] reads:
Fellow Countrymen,

At this second appearing, to take the oath of the presidential office, there is less occasion for an extended address than there was at the first. Then a statement, somewhat in detail, of a course to be pursued, seemed fitting and proper. Now, at the expiration of four years, during which public declarations have been constantly called forth on every point and phase of the great contest which still absorbs the attention, and engrosses the enerergies [sic]

of the nation, little that is new could be presented. The progress of our arms, upon which all else chiefly depends, is as well known to the public as to myself; and it is, I trust, reasonably satisfactory and encouraging to all. With high hope for the future, no prediction in regard to it is ventured.

On the occasion corresponding to this four years ago, all thoughts were anxiously directed to an impending civil war. All dreaded it--all sought to avert it. While the inaugeral [sic] address was being delivered from this place, devoted altogether to *saving* the Union without war, insurgent agents were in the city seeking to *destroy* it without war--seeking to dissole [sic] the Union, and divide effects, by negotiation. Both parties deprecated war; but one of them would **\*43** *make* war rather than let the nation survive; and the other would *accept* war rather than let it perish. And the war came.

One eighth of the whole population were colored slaves, not distributed generally over the Union, but localized in the Southern part of it. These slaves constituted a peculiar and powerful interest. All knew that this interest was, somehow, the cause of the war. To strengthen, perpetuate, and extend this interest was the object for which the insurgents would rend the Union, even by war; while the government claimed no right to do more than to restrict the territorial enlargement of it. Neither party expected for the war, the magnitude, or the duration, which it has already attained. Neither anticipated that the *cause* of the conflict might cease with, or even before, the conflict itself should cease. Each looked for an easier triumph, and a result less fundamental and astounding. Both read the same Bible, and pray to the same God; and each invokes His aid against the other. It may seem strange that any man should dare to ask a just God's assistance in wringing their bread from the sweat of other men's faces; but let us judge not that we be not judged. The prayers of both could not be answered; that of neither has been answered fully. The Almighty has his own purposes. "Woe unto the world because of offences! for it must needs be that offences come; but woe to that man by whom the offence cometh!" If we shall suppose that American Slavery is one of those offences which, in the providence of God, must needs come, but which, having continued through His appointed time, He now wills to remove, and that He gives to both North and South, this terrible war, as the woe due to those by whom the offence came, shall we discern therein any departure from those divine attributes which the believers in a Living God always ascribe to Him? Fondly do we hope--fervently do we pray--that this mighty scourge of war may speedily pass away. Yet, if God wills that it continue, until all the wealth piled by the bondsman's two hundred and fifty years of unrequited toil shall be sunk, and until every drop of blood drawn with the lash, shall be paid by another drawn with the sword, as was said three thousand years ago, so still it must be said "the judgments of the Lord, are true and righteous altogether[."]

With malice toward none; with charity for all; with firmness in the right, as God gives us to see the right, let us strive on to finish the work we are in; to bind up the nation's wounds; to care for him who shall have borne the battle, and for his widow, and his **\*44** orphan--to do all which may achieve and cherish a just, and a lasting peace, among ourselves, and with all nations. [94]

The last paragraph of the Second Inaugural is the shortest paragraph, but at seventy-five words, also contains the longest sentence. During his final editing, Lincoln pasted a slip over the last section following his dash so that it read "to do all which may achieve and cherish a just, and a lasting peace, among ourselves, and with all nations" instead of the earlier version's ending "to achieve and cherish a lasting peace among ourselves, and with our world." [95] Again, Lincoln's change focuses more on rhythm and sound than on any literal change in meaning. [96] Furthermore, this is another example that Lincoln did not value brevity over all other persuasive and rhetorical devices. He added seven words to achieve "the rhetorical device he ... most perfectly mastered over the years, the measured antithesis" to convey his ideal that magnanimity should guide a victorious nation. [97]

The Second Inaugural is today remembered for its timelessness, sacredness, and theme of reconciliation. [98] Some lament that the Second Inaugural has always been overshadowed by the Gettysburg Address. [99] Both are masterful examples of the power of brevity. Both are short and use short words, and yet still convey universal and lasting ideals and values. These two speeches, from all of Lincoln's work, were selected for the Lincoln Memorial. [100]

**\*45  V. Adopt Lincoln's Habits to Achieve Brevity: Start Writing Early, Visualize Your Overworked Judicial Audience, and Ruthlessly Edit.**

Lincoln worked hard for brevity and eloquence. William Herndon, Lincoln's law partner in Springfield, Illinois, noted that Lincoln was a slow writer "who liked to sort out his points and tighten his logic and his phrasing." [101] Lincoln wrote, rewrote, and edited his speeches. One story from Lincoln's personal life attests to Lincoln's tendency to labor over complex problems:

Willie [Lincoln's son] was bright, articulate, and exceptionally sensitive toward the feelings of others. Lincoln believed the child's mind was much like his own. Watching Willie solve a difficult problem, he told a visitor, "I know every step of the process by him, as it is by just such slow methods I attain results." [102]

Wills emphasizes, "The spare quality of Lincoln's prose did not come naturally but was worked at .... This, surely, is the secret of Lincoln's  **\*46**  eloquence. He not only read aloud, to think his way into sounds, but wrote as a way of ordering his thoughts." [103]  Lincoln's son Robert Todd Lincoln also noted that Lincoln was a slow and deliberate writer, but that Lincoln was not daunted by the labor of writing. [104]

It may disappoint some to learn that Lincoln did not possess a creative muse allowing him to quickly dash off speeches that continue to inspire. However, the truth that Lincoln worked, and worked hard, to compose his speeches should be a source of inspiration to the brief writer. We cannot hope to match Lincoln's eloquence, but by adopting his habits of writing in advance, visualizing audience, and ruthlessly editing, we can improve the persuasiveness of our own briefs. [105]

*A. Start Writing Early.*

Lincoln always started writing his speeches early, at least by making notes on scraps of paper. [106]  No early handwritten drafts of the First Inaugural Address, except for one scrap related to the first sentence, survive but Lincoln likely worked on the ideas in the address for several months, and drafted in earnest at least two weeks before leaving Springfield, Illinois, for Washington. [107]  When he left Springfield for Washington, he had drafted and revised several printed copies. [108]  Lincoln drafted the First Inaugural far enough in advance to seek advice from several colleagues. [109]  A witness observed Lincoln putting his Second Inaugural Address into a drawer six days before it was to be delivered. [110]

**\*47**  A common but misguided myth is that Lincoln quickly composed the Gettysburg Address on a discarded piece of paper while riding the train to Gettysburg. [111]  Not true! Lincoln was formally invited to speak at Gettysburg just seventeen days before the November 19, 1863, event, [112]  but he was not cavalier in preparing the Gettysburg Address. Instead, he wrote and rewrote the speech several times. [113]  White concludes, "Lincoln's genius grew not from spontaneity but from hard, painstaking work with words." [114]

Lincoln worked very hard to learn anything new, and he learned by reading. [115] Lincoln emphasized the importance of diligence for lawyers. [116] In 1860, when he was a candidate for President, he responded to a young man's question about the best way to learn the law, "The mode is very simple, though laborious and tedious. It is only to get the books, and read, and study them carefully .... Work, work, work, is the main thing." [117] He knew that diligence in refining his work would pay off with increased persuasiveness.

 **48** Legal writers should follow Lincoln's lead and start writing early. Professor Linda Edwards emphasizes, "Good writing takes time--almost always more time than the writer first expects." [118] Plus, writing the brief is an essential step in understanding the case. The act of writing forces the writer to think about and develop the legal arguments, to notice strengths and weaknesses, and to craft an organized structure. [119] Finally, writing the brief early ensures enough time for editing. [120]


### B. Visualize Audience: Judges Value Brevity.

Lincoln learned to visualize his audience when he litigated cases. [121] He "ordinarily ended [his summation] with a low-key, logical argument that jurors could readily understand." [122] When Lincoln the Lawyer became Lincoln the President he knew he must write and speak both for those in the live audience and for those who would read his speeches in newspapers. [123]

Lincoln was well aware of the strategy of considering his audience. His First Inaugural focused on both Southerners and those of the loyal public, particularly those Unionists who needed convincing that Lincoln was a capable leader. [124] Lincoln scholar Douglas Wilson opines that Lincoln engaged in the "artful enterprise" of "[s]peaking to one audience as a way of getting through to another." [125] Lincoln's speech rejected Southern claims, but he did not use the First Inaugural to respond to the secessionist's most important arguments, instead using his words to show he was a reasoned and firm leader opposed to secession. [126]

The audience at Gettysburg, estimated between 15,000 and 20,000 people, had waited for hours for the dedication. [127] Lincoln knew that there  **49** would be a crowd, and that the crowd would include several state governors. [128] He knew the audience was becoming war weary. He wanted to use this speech to define the war outside his usual reports to Congress. [129] He cleansed the bloody battlefield and said that the physical residue of the battle was a test of whether a "government can maintain the *proposition* of equality." [130] He used the Gettysburg Address to define his war aims, which included winning the Civil War on both ideological and military terms. [131]

The audience for the Second Inaugural was even more war weary, and many citizens felt both anger and hope as the "death and despair [from the Civil War] reached into nearly every home." [132] The audience wondered what Lincoln would say about the conquered Confederates, the slaves, and suffrage. [133] Between 30,000 and 40,000 people crowded into Washington to hear the speech. [134] Lincoln knew his audience would include dignitaries, soldiers, African Americans, his supporters, and those who despised him. [135] He spoke to all, asking them to think with him about the war, its cause, and its aftermath. [136] At the inauguration reception later in the day, Lincoln himself told Frederick Douglass that he saw him in the crowd during his Second Inaugural address. Lincoln asked Douglass what he thought of the speech, "[T]here is no man in the country whose opinion I value more than yours. I want to know what you think of it?" "Mr. Lincoln, that was a sacred effort," Douglass replied. [137]

Some wonder how Lincoln would fare in the modern political climate with an audience preference for sound bites. Lincoln admirer Theodore Sorenson has no doubt that Lincoln would appeal to a modern audience, "He had a talent for getting to the point." [138]

Many writers struggle to write for their audience because they are not exactly sure who may read their work. In this regard, we lawyers have it easy.  **\*50**  We know our primary audience is the judge or judges, and their law clerks, who will read the brief and make the decision. [139]  Judges are human, [140]  with the same limited attention span and preference for brevity as all other humans. [141]  They are persuaded by a writer who includes enough so that the argument and facts are understandable but does not include anything that is not essential. [142]

Let's visualize those overworked and underpaid judges. The judicial workload statistics are shocking. In 1992, one federal appellate judge estimated that he read 3,500 pages of briefs a month. [143]  How many more pages does a judge read today? The case filings in the appellate courts have increased fifty-five percent since 1990, and the district court filings have increased twenty-nine percent over those same eighteen years. [144]  This caseload works out to an astonishingly heavy workload of 464 cases per district court judge and 1,230 cases per three-judge appellate panel. [145]

 **\*51**  Judges are busy, brief reading competes with other demands on a judge's time, and "briefs are not read at a leisurely pace and their contents savored and digested in a contemplative environment." [146]  Brief writers may be tempted to imagine a judge reading a brief in her robes, and that may be true, but the robes worn may be bathrobes instead of judicial robes because there simply is not time in the day to complete all the brief reading. [147]

We know from both anecdotal and empirical evidence that judges value brevity. [148]  What more are we lawyers waiting for? I am not sure why we have trouble following such an explicit reader preference.

Perhaps we think the judges are wrong in asking for brevity. The judges are not wrong, but even if Court rules and preferences do not make sense, we follow those rules and preferences to maximize persuasiveness. If a Court requires a brief writer to affix a white feather to the cover page of every brief, then we should start looking for white feathers. Perhaps we think the judges are referring to everyone but us. Maybe we view ourselves as such brilliant writers that a judge finds it enjoyable to read as many words from our golden pens as possible. Maybe we believe that brevity works for everyone else's simple case, but not our complex cases. This thinking is simply wrong. Even the most brilliant writer will be more persuasive when writing with brevity. If the case is complex, brevity is even more essential because "[t]he substance of legal analysis is complicated enough without adding to the confusion by using unnecessarily complex sentence structure and complicated wording." [149]

Finally, perhaps we think it is just too hard or takes too much time to write with brevity. Many are familiar with the adage, "If I had more time, I would write a shorter letter." [150]  Writing with brevity admittedly requires diligence, but diligence is what we promise to our clients. [151]  Beware of seeing yourself as an exception to the brevity preference. The judges are talking to you because they are talking to all of us.

 **\*52  C. Ruthlessly Edit for Brevity.**

I initially titled this section, "Ruthless Writing for Brevity" but then realized that for most legal writers brevity does not come naturally in the initial drafting stage. Like so many other aspects of persuasive legal writing, the best way to improve writing is with editing. Editing for brevity works at every level of the legal brief: the complete

brief, individual sections of the brief, paragraphs, sentences, and especially words. [152] Shorter is almost always better in almost every situation. If you have time to edit for only one single problem, edit for brevity. [153] This is the most consistent preference expressed by judges. [154]

One caveat for the legal writer is to write so that the reader remains interested. If every section within a brief is the exact same length, every sentence has the same number of words, or every word has the same number of syllables, you will lull your reader into boredom. [155] Write with brevity, but do not forget the value of variety.

Lincoln did not always use short speeches, short sentences, or short words. Not every word or sentence in the Gettysburg Address or the Second Inaugural is short. Both end with very long sentences--the Gettysburg Address with an eighty-three-word sentence, almost a third of the speech's length, [156] and the Second Inaugural with a seventy-five-word sentence. [157]

Still, Lincoln deliberately chose short sentences and short words whenever possible. He preferred "short words to long, words of Anglo-Saxon origin to those of Latin derivation." [158] The Saxon words are briefer and have **\*53**  more punch. [159] He also drew on his memory when writing and did not try to use novel language. [160] He used each word carefully and precisely. [161]

Legal brief writers should follow Lincoln's lead and write short briefs, using short sentences and short words as often as possible. The "plain English" movement has long urged legal writers to write in short sentences and use concrete and familiar words. [162] A persuasive legal writer recognizes that writing with brevity, simple language, and simple sentences helps clarify the complexity of the legal analysis. [163]

We have seen Lincoln's ruthlessness when editing for brevity. [164] Lincoln made changes and revisions in all his writings. [165] With the advent of word processing, ruthless editing is even more necessary today. [166] We are faced with the strange phenomenon of seeing our first drafts in a polished format. We struggle to start drafting, but finally think, "Oh, I'm just going to get started. I'll change it all later, but I need to get something, anything, down on paper." We then start spewing words, sentences, whole paragraphs into a Microsoft Word document. Fast forward to the moment when the writer is ready to edit the work. Reading through the drafted material the writer thinks, "Hey, this is really not that bad. In fact, if I must say so myself, this looks pretty good. Maybe even brilliant." The moment the writer thinks, "I don't even have to edit this brief" is the moment when the "Danger! Danger!" warning should be going off in her head. [167]

 **\*54**  We must resist the temptation to believe that our first drafts are adequate, let alone brilliant. Instead, edit with a ruthless spirit. Pretend you did not write the first draft. Imagine that the first draft was written by someone with a particularly annoying trait--writing without brevity. Your job is to notice everything that is not absolutely essential and then delete it. Simplify sentences and words. The original author will thank you. Even more importantly, the judge deciding the case is more likely to be persuaded.

## Conclusion

"Whatever happened to eloquence? Do 21st century Americans not really care about rhetoric? Is rhetoric an old-fashioned word that looks backward to an earlier age?" [168] As legal writers, let us answer this lament with a resounding chorus that we care about eloquence, rhetoric, [169] and persuasive writing. Let's show that we care by writing with brevity.

For our inspiration, we should look to Abraham Lincoln. Lincoln, although self-confident, did not consider himself a great writer. [170] His personal secretaries John G. Nicolay and John Hay declared, "Nothing would have amazed him [Lincoln] while he lived than to hear himself called a man of letters." [171] We know better--Lincoln was a brilliant writer. We can find inspiration from Lincoln's compelling and extraordinary use of the virtue of brevity.

Brevity is a virtue like many other virtues. Common wisdom advises that practicing virtues makes them easier. This is true of the virtue of writing with brevity. In the beginning it is painful to delete unnecessary pages, arguments, and words. But one day you will find yourself noticing and valuing brevity. On that day, you place a three-page holiday letter directly into the recycling bin. A note from your child's teacher that exceeds three sentences seems redundant. You wonder why any e-mail message contains complicated words. You find yourself editing your opponent's brief and cutting it by thirty percent without eliminating anything essential, but instead improving the brief's persuasiveness. These are all the normal symptoms of making brevity a part of your own writing.

Ultimately, you will acquire the virtue of brevity and perhaps even follow the mantra, "Brevity persuades. I will adopt Lincoln's habits." [172]

## Footnotes

a1   © Julie A. Oseid 2009. Associate Professor of Law, University of St. Thomas School of Law, Minneapolis, Minnesota. I owe thanks to several people for helping with this article. First, my brother Professor Stephen D. Easton from the University of Missouri Law School inspired this article when he gave me his old copies of *Smithsonian* magazine. The April 2002 article about Ronald C. White, Jr.'s book *Lincoln's Greatest Speech: The Second Inaugural* started me on my path to researching and writing about Lincoln's use of brevity in his Presidential speeches. Professor Charles J. Reid, Jr. helped me on that path when he recommended that I visit Renaissance Books in the General Mitchell International Airport in Milwaukee. During an unexpected six-hour layover I purchased several books about Lincoln and perused many others. Professor Michael Stokes Paulsen stopped to talk with me in the hallway about my article and then generously bought me Douglas L. Wilson's *Lincoln's Sword: The Presidency and the Power of Words*. Librarian Mary Wells researched the history of the Lincoln Memorial. Alan Heavens was my able and enthusiastic research assistant for this project. He tirelessly tracked down answers to all my detailed questions. He was also a great sounding board for my ideas. Last, but certainly not least, I thank the editors from J. ALWD, especially Professor Melody Daily. It is frightening to send an article to a peer-reviewed journal. Professor Daily and my other editors, including Sue Painter-Thorne and Linda Berger, made the process one of my very best educational experiences. They improved my writing, forced me to prove my thesis, and encouraged me. Unintentionally and incidentally, they taught me how to be a better writer, editor, and teacher.

1   Lincoln is often lauded as our most eloquent president. *See* Ronald C. White, Jr., *The Eloquent President: A Portrait of Lincoln Through His Words* 308 (Random House 2005) ("Lincoln's eloquence may prove to be his most lasting legacy.") [hereinafter White, *The Eloquent President*].

2   *See infra* discussion at Part V.B. (examining judicial preference for brevity and increased judicial work load).

3   Although this is a "short" article by law review standards, I am far surpassing the length of the shortest law review article. That distinction goes to one of the following articles, depending on how titles, text, and footnotes are counted: Erik M. Jensen, *The Shortest Article in Law Review History*, 50 J. Leg. Educ. 156, 156 (2000) ("This is it."); Grant H. Morris, *The Shortest Article in Law Review History: A Brief Response to Professor Jensen*, 50 J. Leg. Educ. 310, 310 (2000) ("Not so!"); Thomas H. Odom, *A Response to Professors Jensen and Morris*, 50 J. Leg. Educ. 311 (2000) ("Why?"). *See also* Erik M. Jensen, *The Intellectual History of "The Shortest Article in Law Review History"* (Case Research Paper No. 08-29, 2008) (available at http:// ssrn.com/abstract=1277394). *Cf.* Jeremy A. Blumenthal, *The Problem Of The Two Ships Peerless*, 35 Seton Hall L. Rev. 1097 (2005) ("Neither was.").

4    *Lincoln's Own Stories* 36 (Anthony Gross ed., Harper & Bros. 1912).

5    Webster's Dictionary defines brevity as "the quality of expressing much in few words; terseness; succinctness." *Webster's American Dictionary* 99 (2d college ed., Random House 2000).

6    "Succinct" is defined as "expressed in few words; concise; terse; characterized by conciseness or verbal brevity." *Id.* at 786. Terse is defined as "neatly or effectively concise; brief and pithy, as language." *Id.* at 812.

7    I rejected several synonyms because of their connotations: "concise" seems technical; "succinct" seems scientific; and "terse" seems impatient.

8    *See* Helene S. Shapo, Marilyn R. Walter & Elizabeth Fajans, *Writing and Analysis in the Law* 3 (5th ed., Found. Press 2008) ("[L]awyers write all the time .... To be a good lawyer, you must be a good writer."). Linda Edwards points out, "Most lawyers write and publish more pages than a novelist, and with greater consequences hanging in the balance." Linda H. Edwards, *Legal Writing: Process, Analysis, and Organization* 1 (4th ed., Aspen Publishers 2006).

9    Alex Kozinski, *The Wrong Stuff*, 1992 BYU L. Rev. 325, 327 (1992).

10   *See* Ruggero J. Aldisert, Stephen Clowney & Jeremy D. Peterson, *Logic for Law Students: How to Think Like a Lawyer*, 69 U. Pitt. L. Rev. 1, 7 (citing S. Morris Engel, *With Good Reason: An Introduction to Informal Fallacies* 20 (6th ed., Bedford Books 2000)).

11   Ronald C. White Jr., *Lincoln's Greatest Speech: The Second Inaugural* 76 (Simon & Schuster Paperbacks 2002) [hereinafter White, *Lincoln's Greatest Speech*]; *see also infra* Part V.C. (advising that a legal writer should write with variety to maintain reader attention).

12   Theodore C. Sorenson, *A Man of His Words*, Smithsonian 96, 103 (Oct. 2008).

13   Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 25, 59, 98, 106, and 182 (Thomson West 2008).

14   *Id.* at 98; *see also* Ruth Anne Robbins, *Painting with Print: Incorporating Concepts of Typographic and Layout Design into the Text of Legal Writing Documents*, 2 J. ALWD 108, 111 (2004) (arguing that visual effects of a document can influence the writer's credibility).

15   *See* Ruggero J. Aldisert, *Winning on Appeal* 25 (2d ed., NITA 2003).

16   Kozinski, *supra* n. 9, at 327.

17   Kristen K. Robbins, *The Inside Scoop: What Federal Judges Really Think About the Way Lawyers Write*, 8 Leg. Writing 257, 260 (2002). Robbins explains the depth of her study:
     Surveys were sent to all sitting federal judges on the supreme, circuit, and district court level (excluding senior and bankruptcy judges). One Supreme Court justice, 68 (out of 163) circuit judges, and 286 (out of 601) district court judges responded to the survey. These 355 responses represent forty-six percent of all federal judges as of September 1999. *Id.* at 261 (footnotes omitted).

18   *Id.* at 257.

19   The survey results showed:
     Judges seem most interested in an advocate's ability to be brief. From the judges' perspective, conciseness is not inspirational, it is essential. Seventy-three of the 355 judges who participated volunteered that the best briefs are concise; 70 said that the worst briefs fail to be concise; and 118 said that conciseness should be taught in law school writing courses. *Id.* at 279.

20   *Id.*

THE POWER OF BREVITY: ADOPT ABRAHAM..., 6 U. Mass L. Legal...

Case: 4:13-cv-05889-YGR    Document 264    Filed 10/03/14    Page 16 of 25

21    *Id*. at 281.

22    In some versions the last word in Hemingway's short story is "worn" instead of "used." *See In which Hemingway short story is the saying, "Children's shoes for sale"?* http://www.cliffsnotes.com/WileyCDA/Section/In-which-Hemingway-short-story-is-the-saying-Childrens-shoes-for-sale-.id-305403,articleId-41062.html (last accessed June 19, 2009) (noting that Hemingway scholars are not able to confirm that he wrote this story, but neither are they able to prove that he did not write the story). This myth inspired one new book, *Not Quite What I Was Planning: Six-Word Memoirs by Writers Famous & Obscure* (Larry Smith & Rachel Fershleiser eds., Harper Perennial 2008). *See also* Susan Henderson, *Smith Magazine*, http:// litpark.com/2008/02/06/smith-magazine/ (last accessed June 19, 2009).

23    Douglas L. Wilson notes, "Lincoln has thus become one of the most admired of all American writers. 'Alone among American presidents,' Edmund Wilson has written, 'it is possible to imagine Lincoln, grown up in a different milieu, becoming a distinguished writer of a not merely political kind.'" Douglas L. Wilson, *Lincoln's Sword: The Presidency and the Power of Words* 4 (Vintage Books 2006) (quoting Edmund Wilson, *Patriotic Gore: Studies in the Literature of the American Civil War* 122 (Oxford U. Press 1962)) [hereinafter Wilson, *Lincoln's Sword*]. Theodore C. Sorenson, former special counsel to President John F. Kennedy, studied all previous 20th Century inaugural addresses to help Kennedy prepare his inaugural speech. Sorenson notes, "Lincoln was a superb writer. Like Jefferson and Teddy Roosevelt, but few if any other presidents, he could have been a successful writer wholly apart from his political career." Sorenson, *supra* n. 12, at 98. Lincoln Biographer Fred Kaplan notes that Lincoln and Thomas Jefferson were the American presidents who most eloquently expressed the national concerns, but nothing Jefferson wrote during his presidency has "a permanent place in the literary or political canon." Fred Kaplan, *Lincoln: The Biography of a Writer* 320-21 (HarperCollins 2008).

24    I am well aware that tying my thesis that brevity persuades to Lincoln's use of brevity increases the attractiveness of the article. As Maury Klein aptly noted, "For more than a century, the Lincoln literature has been a mother lode for writers and publishers. An old joke proclaimed that the ideal surefire best-seller would be a book entitled Lincoln's Doctor's Dog."). Maury Klein, *Book Review*, 9 Roger Williams U. L. Rev. 213, 215 (2003) (reviewing *Judging Lincoln* by Frank J. Williams). The author of the book reviewed by Klein, Frank J. Williams, is retired Chief Justice of the Rhode Island Supreme Court and a lifelong Lincoln scholar. He estimates that sixteen thousand books about Lincoln have been written. Frank J. Williams, *Abraham Lincoln: Commander in Chief or "Attorney in Chief?"*, 18 Spring Experience 12, 13 (Spring 2008) [hereinafter Williams, *"Attorney in Chief?"*].

25    Sorenson, *supra* n. 12, at 102-03.

26    Douglas L. Wilson, *Honor's Voice: The Transformation of Abraham Lincoln* 71 (Alfred A. Knopf, Inc. 1998) [hereinafter Wilson, *Honor's Voice*]. Lincoln loved all forms of literature. Kaplan, *supra* n. 23, at 292 (noting that Lincoln was an avid reader of literary anthologies, Shakespeare, Bryon, Burns, and *The Bible*). Kaplan contends that John Quincy Adams is the only other President who loved literature as much as Lincoln. *See id*. at 346.

27    Wilson, *Lincoln's Sword*, *supra* n. 23, at 266.

28    Without specifically mentioning brevity, Justice Williams notes,
This goal [political leadership] remained primary in the imperatives which animated his very being. But, having said that, it is clear that devotion to the law was a significant aspect of Abraham Lincoln's life. As I hope to demonstrate in this article, in achieving his political goals, he constantly utilized skills and tactics honed in the courtroom and in other phases of his legal life.
Williams, *"Attorney in Chief?", supra* n. 24, at 13-14.

29    For an excellent discussion of the early books discussing Lincoln's legal career, consult Mark Steiner's book *An Honest Calling: The Law Practice of Abraham Lincoln* 5-25 (N. Ill. U. Press 2006) (chapter one is entitled, "Lawyer Lincoln in American Memory"). In 1906, a book review in the Yale Law Journal became the first to cite a book about Lincoln's career as a lawyer. *Book Review*, 16 Yale L.J. 154 (1906) (reviewing Frederick Trevor Hill's *Lincoln the Lawyer* and noting that "little attention has been given to [Lincoln's] professional career"); *see also* John J. Duff, *A. Lincoln: Prairie Lawyer* (Rinehart & Co., Inc. 1960); Robert Littler, *Book Review*, 15 Stan. L. Rev. 146 (1962) (reviewing John P. Frank's *Lincoln as a Lawyer);* John Maxcy Zane, *Lincoln, the Constitutional Lawyer* (Caxton Club 1932).

30    Brian Dirck, *Lincoln the Lawyer* 171 (U. of Ill. Press 2007). Dirck also notes that over half of the American presidents have been lawyers. *Id.*

31    Steiner, *supra* n. 29, at 15 (quoting Benjamin P. Thomas, *Abraham Lincoln: A Biography* 410 (1952)).

32    Williams, *"Attorney in Chief?"*, *supra* n. 24, at 13.

33    *Abraham Lincoln Online*, *Lincoln Legal Practice DVD-ROM Released*, http://showcase netins net/web/creative/lincoln/news/dvdrom.htm (last accessed June 19, 2009) (the project lasted fifteen years and was completed in 2000).

34    Dirck, *supra* n. 30; Julie M. Fenster, *The Case of Abraham Lincoln* (Palgrave MacMillan 2007); Allen D. Spiegel, *Lincoln, Esquire: A Shrewd, Sophisticated Lawyer in His Time* (Mercer U. Press 2002); Steiner, *supra* n. 29; Frank J. Williams, *Judging Lincoln* (S. Ill. U. Press 2002).

35    *See* Steiner, *supra* n. 29, at 18 ("Abraham Lincoln is one of the great heroes of the American legal profession.").

36    Dirck, *supra* n. 30, at 142 ("Lincoln the great American was in reality a pretty ordinary attorney."); Steiner, *supra* n. 29, at 55 ("While Lincoln had an extraordinary life, he also had a relatively ordinary law practice. If Lincoln hadn't become president, it's doubtful that his law practice would have been noticed by later historians.").

37    Doris Kearns Goodwin, *Team of Rivals* 703 (Simon & Schuster Paperback 2005).

38    Dirck, *supra* n. 30, at 7. Dirck also emphasizes the professional balance lawyers need because of the changing nature of the profession when adversaries one day can become cocounsel or even judge and advocate the next day. *Id.* at 43.

39    *Id.* at 154-55. Dirck explains his new theory about Lincoln as "grease":
[Lincoln's law practice] taught him about the value of grease--that unglamorous, often overlooked but vital substance that lubricates and reduces friction to acceptable levels, that slips between the cogs and devices of machines and allows continuous movement without malfunction. Lincoln's age sorely needed grease .... Abraham Lincoln the attorney applied his own form of grease, in a multitude of visible and not so visible ways.
*Id.* at 155.

40    Jerry J. Phillips, *Uncommon Predicates: Notes on Lincoln's Second Inaugural Address*, 72 Tenn. L. Rev. 807, 810 (2005).

41    Steiner comments that John J. Duff's book *A. Lincoln, Prairie Lawyer* (Bramhall House 1960) notes that "Lincoln, while he was a lawyer, developed his judgment, lucidity of expression, and unforgettable prose." Steiner, *supra* n. 29, at 23.

42    David Herbert Donald, *Lincoln* 145 (Simon & Schuster 1995).

43    *Id.* at 98.

44    *See* Kaplan, *supra* n. 23, at 234-35.

45    Donald, *supra* n. 42, at 149. Lincoln did not yield essentials. Leonard Swett, a Bloomington lawyer who traveled the circuit with Lincoln, said that Lincoln only gave away what he could not get and keep. Donald notes, "Many a rival lawyer was lulled into complacency as Lincoln conceded, say, six out of seven points in argument, only to discover that the whole case turned on the seventh point." *Id.*

46    Dirck, *supra* n. 30, at 152.

47    White, *The Eloquent President*, *supra* n. 1, at 97 (noting also that Lincoln relied on precedent by referring to his previous political speeches, his own precedential legal arguments, dating back into the late 1850s).

48    Dirck, *supra* n. 30, at 12-13.

49    *See* White, *Lincoln's Greatest Speech*, *supra* n. 11, at 69 (asserting that Lincoln lived at a time that put a priority on the spoken word). White notes, "Lincoln worked hard to learn the dynamics of the spoken word .... His personal magnetism came to life through the ear, not the eye." *Id.* at 72.

50    *Id.* at 187 (stating that Lincoln used the newspaper as his political platform because he recognized that newspapers reached thousands of people). The newspaper printed an exact copy of the speech as spoken because newspaper reporters at that time used shorthand to record speeches. *Id.* at 70.

51    The First Inaugural reached California by both telegraph and the Pony Express. "The speech was first telegraphed from New York to Kearney, Nebraska. Lincoln's words were then placed in the saddlebags of Pony Express riders for their relay across plains and mountains to Folsom, California. The [First I]naugural was then telegraphed to Sacramento and from there to other points in the far West." White, *The Eloquent President*, *supra* n. 1, at 94.

52    White, *Lincoln's Greatest Speech*, *supra* n. 11, at 183 (explaining that Western Union connected the telegraph wired from New York to San Francisco on March 5, 1865, the day after Lincoln delivered the Second Inaugural).

53    Kaplan, *supra* n. 23, at 291.

54    White, *Lincoln's Greatest Speech*, *supra* n. 11, at 187.

55    Wilson, *Honor's Voice*, *supra* n. 26, at 62.

56    *Id.*

57    *Id.*

58    White suggests that we examine Lincoln's speeches "not in splendid isolation from one another, but ... together in all their shimmering beauty." White, *The Eloquent President*, *supra* n. 1, at xxii. White also notes that "[a] purpose of this book is to see Lincoln's speeches as a string of pearls. Each pearl, although of different color and size, possesses its own beauty." White, *Lincoln's Greatest Speech*, *supra* n. 11, at 224.

59    The First Inaugural was a long speech, but Lincoln effectively edited the concluding paragraph for brevity. A word count of the official copy of the First Inaugural reveals it is 3,633 words long. *See* Independence Hall Assn., *Lincoln's First Inaugural Address*, http:// www.ushistory.org/documents/lincoln1 htm (last accessed June 19, 2009). Lincoln delivered the First Inaugural in thirty-five minutes. White, *Lincoln's Greatest Speech*, *supra* n. 11, at 22.

60    White, *The Eloquent President*, *supra* n. 1, at 68-69. Seward made more suggestions than other editors. Lincoln asked Judge David Davis from Springfield, Illinois, to read the speech. Judge Davis "appreciated the speech and made no suggestions." *Id.* at 67. He also asked fellow lawyer Orville H. Browning who offered a single suggestion that Lincoln delete the clause "to reclaim the public property and places which have fallen" which might provoke the South. *Id.* at 68. Francis P. Blair, Sr., also read the speech "and enthusiastically commended the whole address." *Id.* at 68.

61    *Id.* at 63, 68-69.

62    *Id.* at 69.

63    White also points out that Lincoln chose to edit Seward's shortest submitted version of edits, instead of Seward's longer version submitted at the same time. *Id.* at 90.

64    *Id.* at 91.

65    *Id.*

66    Wilson, *Lincoln's Sword*, supra n. 23, at 66-67 (citing Don E. Fenhrenbacher, "The Words of Lincoln," *Lincoln in Text and Context* 285 (Stanford U. Press, 1987)).

67    *Id.* at 68.

68    Kaplan, *supra* n. 23, at 326.

69    White, *The Eloquent President, supra* n. 1, at 97.

70    Sorenson, *supra* n. 12, at 102. Part of that greatness is attributable to the content of the speeches which both deal with the largest and most important ideals. *Id.*

71    Garry Wills, *Lincoln at Gettysburg: The Words That Remade America* 35 (Simon & Schuster Paperbacks 1992).

72    *Id.* at 20 (noting the speech was 272 words long). A word count of the speech indicates that it is 271 words long, but if "battle-field" is counted as two words instead of as one word the speech is 272 words long.

73    *See* White, *The Eloquent President, supra* n. 1, at xxii ("Lincoln's pattern was to speak or read his addresses slowly. The average person speaks at about 150 or 160 words per minute. Lincoln spoke 105 to 110 words per minute.").

74    This is an estimate based on Lincoln's average speaking pace. *See* Wills, *supra* n. 71, at 36 ("Read in a slow, clear way to the farthest listeners, the speech would take about three minutes.").

75    *See* Donald, *supra* n. 42, at 464 (reporting that Everett made a two-hour address).

76    *See* Wills, *supra* n. 71, at 23 (explaining that a long address for this kind of event was customary at that time).

77    *Id.* at 35.

78    Natl. Park Serv., *Lincoln Memorial Design and Symbolism*, http:// www.nps.gov/linc/historyculture/lincoln-memorial-design-and-symbolism htm (last accessed June 19, 2009) (stating that the Gettysburg Address was chosen "for its familiarity to many, but also because it displayed the president's strength and determination to see a successful conclusion to the American Civil War").

79    There is some dispute about the final version of the Gettysburg Address. The version used here is Lincoln's final version, called the Bliss text. *See* Wills, *supra* n. 71, at 18, App. III D 2.

80    That count is based on the following analysis (with single syllable words italicized):
*Four score and* seven *years ago our* fathers *brought forth on this* continent, *a new* nation, conceived *in* Liberty, *and* dedicated *to the* proposition *that all men are* created equal. *Now we are* engaged *in a great* civil *war*, testing whether *that* nation, *or any* nation *so* conceived *and so* dedicated, *can long* endure. *We are met on a great* battle-*field of that* war. *We have come to* dedicate *a* portion *of that field, as a* final resting *place for those who here gave their lives that that* nation *might live. It is* altogether fitting *and* proper *that we should do this.*
*But, in a* larger *sense, we can not* dedicate--*we can not* consecrate--*we can not* hallow--*this ground. The brave men,* living *and dead, who* struggled *here, have* consecrated *it, far* above *our poor power to add or* detract. *The world will* little *note, nor long* remember *what we say here, but it can* never forget *what they did here. It is for us the* living, rather, *to be* dedicated *here to the* unfinished *work which they who fought here have thus far so* nobly advanced. *It is* rather *for us to be here* dedicated *to the great task* remaining before *us-- that from these* honored *dead we take* increased devotion *to that cause for which they gave the last full* measure *of* devotion--*that we here* highly resolve *that these dead shall not have died in vain--that this* nation, under *God, shall have a new birth of* freedom--*and that* government *of the* people, *by the* people, *for the* people, *shall not* perish *from the earth.*

81    *See* Wilson, *Lincoln's Sword, supra* n. 23, at 281. Wilson also notes that Lincoln's "homespun stories and expressions drew the public to him." *Id.*

82    *See id.*

83    Wills, *supra* n. 71, at 38-40.

84    *Id.* at 38.

85    Charles Francis Adams, Jr., a descendant of John Adams and John Quincy Adams, wrote to his father after hearing the Second Inaugural, "This inaugural strikes me in its grand simplicity and directness as being for all time the historical keynote of this war." White, *Lincoln's Greatest Speech*, *supra* n. 11, at 184.

86    *Id*. at 200.

87    *Id*. at 197. Lincoln also added the caveat, "but I believe it is not immediately popular." *Id*.

88    *Id*. at 22-23. Lincoln scholar Ronald C. White, Jr. reports that only one witness reported about Lincoln's composition of the Second Inaugural. Artist Francis C. Carpenter spent six months in residence at the White House. Carpenter reported that he was sitting in Lincoln's office with two other men when Lincoln came in holding a manuscript and said, "Lots of wisdom in that document, I suspect. It is what will be called my second inaugural, containing about six hundred words. I will put it in my drawer until I want it." *Id*. at 49 (quoting Francis B. Carpenter, *The Inner Life of Abraham Lincoln: Six Months at the White House* 234 (Hurd & Houghton, 1874)).

89    White, *The Eloquent President, supra* n. 1, at 282. The speech is 703 words long if the later addition of "Fellow Countrymen" is counted. *Id*.

90    White, *Lincoln's Greatest Speech, supra* n. 11, at 48.

91    White, *The Eloquent President, supra* n. 1, at 282.

92    White, *Lincoln's Greatest Speech, supra* n. 11, at 180.

93    *Lincoln Memorial Design and Symbolism, supra* n. 78.

94    White, *Lincoln's Greatest Speech, supra* n. 11, at 17-19.

95    Wilson, *Lincoln's Sword, supra* n. 23, at 274.

96    *Id*. at 275.

97    *Id*.

98    *Id*. at 164-65, 203.

99    *See* Phillips, *supra* n. 40, at 808; White, *Lincoln's Greatest Speech, supra* n. 11, at 201.

100    *See supra* nn. 78 & 93. Architect Henry Bacon included the Gettysburg Address and the Second Inaugural as important features when he submitted his Lincoln Memorial design to the Lincoln Memorial Commission. Bacon wrote:
From the beginning of my study I believed that this Memorial of Abraham Lincoln should be composed of four features--a statute of the man, a memorial of his Gettysburg speech, a memorial of his second inaugural address, and a symbol of the Union of the United States, which, he stated, it was his paramount object to save, and which he did save .... I believe these two great speeches made by Lincoln will always have a far greater meaning to the citizens of the United States and visitors from other countries that a portrayal of periods or events by means of decoration. I think, however, some reliefs and decoration designed in conjunction with these memorials and representing in allegory Lincoln's qualities, such as charity, patience, intelligence, patriotism, devotion to high ideals, and humaneness, will emphasize the effect of the speeches.
*Lincoln Memorial Commission Report*, Sen. Doc. 965 at app. G, 62d Cong. (1912). The speeches were likely chosen, at least in part, because their brevity allowed Bacon to incorporate the entire speeches into his Memorial. At one point, the Lincoln Memorial Commission asked Bacon to submit alternative designs. He then submitted three alternatives: two with the "two great speeches" and one design with "tablets inscribed with quotations from Lincoln's speeches." *See id*. at app. D (Bacon's Report of the Architect on Alternative Designs for the Potomac Park Site). Because of the brevity of the Gettysburg Address and the Second Inaugural, Bacon did not have to select only quotations. Instead he was able to use the speeches in their entirety.
Bacon's prediction that the two speeches would have great meaning and significance to visitors has proven accurate. Douglas L. Wilson notes:

This may help to explain the way millions of Americans, and a surprising number of people around the world, are affected by Abraham Lincoln's most inspired writing. It perhaps illuminates what visitors commonly experience at the Lincoln Memorial in Washington, where they typically stand in silence and read the words of the Gettysburg Address and the Second Inaugural, both of which are inscribed in their entirety on facing marble walls .... In experiencing these two "high moments," something important is somehow affirmed .... On one wall it says there must first be ideals, then dedication, then a willingness to sacrifice and to persevere. On the other wall it says that even in triumph, the victors share complicity with the vanquished.

Wilson, *Lincoln's Sword*, *supra* n. 23, at 284.

101    Wills, *supra* n. 71, at 28.

102    Donald, *supra* n. 42, at 159. Lincoln also compared his slow way of thinking to a long-bladed jack knife, telling Herndon, "Just so with these long convolutions of my brain ... they have to act slowly--pass as it were through a greater space ... I commence way back like the boys do when they want to get a good start. My weight and speed get momentum to jump far." *Id*. at 102. Yet once he learned something, Lincoln did not forget it. Lincoln noted, "My mind is like a piece of steel--very hard to scratch anything on it and almost impossible after you get it there to rub it out." Kaplan, *supra* n. 23, at 33 (quoting *Recollected Words* 413 (Donald E. Fehrenbacher & Virginia Fehrenbacher eds., Stanford U. Press 1996)).

103    Wills, *supra* n. 71, at 161, 162.

104    Wilson, *Lincoln's Sword, supra* n. 23, at 5. Wilson further notes that "writing was often a form of refuge for Lincoln." *Id*. at 7.

105    Incidentally, like anyone, Lincoln developed both good and bad habits as a lawyer. He was notoriously disorganized. His desk contained an overstuffed envelope with the following words written in his hand, "When you can't find it anywhere else look in this." *See* Dirck, *supra* n. 30, at 38. His office was a mess. Charles Wood, *Abraham Lincoln: Corporate Lawyer*, 27 Mont. Lawyer 13 (Oct. 2001). One of Lincoln's clients "even claimed to have seen seeds sprouting in accumulated dust along the walls of [his] somewhat dilapidated second-story office." *See* Kelly Anderson, *Lincoln the Lawyer*, 58 Or. St. B. Bull. 13 (Feb./Mar. 1998); *see also* Dirck, *supra* n. 30, at 38 (attributing the story of "plants from a half-open bag of bean seeds sprouting in a dirt-encrusted corner" to a young man studying for the bar under Lincoln and Herndon). Lincoln was also a poor speller. *See* copies of the Gettysburg Address and The Second Inaugural, *supra* Part IV.B & IV.C; *see also* White, *Lincoln's Greatest Speech, supra* n. 11, at 206. *But see* Kaplan, *supra* n. 23, at 7-8 (contending that Lincoln was a good speller and noting that a classmate said Lincoln won spelling bees).

106    Wilson, *Lincoln's Sword, supra* n. 23, at 44-45.

107    *Id*. at 45.

108    *Id*. at 59.

109    White, *The Eloquent President, supra* n. 1, at 96.

110    White, *Lincoln's Greatest Speech, supra* n. 11, at 49.

111    White, *The Eloquent President, supra* n. 1, at 232. This story started with several unreliable sources, grew more fanciful, and was perpetuated when the tale was printed as a book, *The Perfect Tribute*, which sold five-hundred thousand copies and was included on several required high school course reading lists. *Id*. at 233-34.

112    *Id*. at 229. Some scholars note that Lincoln was probably informally invited before October 30. Wills, *supra* n. 71, at 25.

113    Wills notes,
The silly, but persistent myth is that he jotted his brief remarks on the back of an envelope. Better-attested accounts have him considering it on the way to a photographer's shop in Washington, writing it on a piece of cardboard as the train took him on the eighty-mile trip, penciling it in David Wills's house on the night before the dedication, writing it

in that house on the morning of the day he had to deliver it, or even composing it in his head as Everett spoke, before Lincoln rose to follow him.
Wills, *supra* n. 71, at 27.

114   *Id*. at 234.

115   Wilson, *Honor's Voice, supra* n. 26, at 57. Wilson paints this vivid picture:
The intensity with which Lincoln laid siege to certain subjects stamped itself indelibly on the memories of his New Salem acquaintances. The most diligently pursued studies were undoubtedly those related to vocational pursuits, most notably surveying and the law. But even his study of English grammar, the first study he took up in earnest, was probably related to a recognition that he needed to come to terms with standard English in order to make a more presentable appearance in public.
*Id*. at 62-63. Interestingly, Lincoln's studiousness, which sometimes took precedence over his duties, was seen as laziness by some of his contemporaries. *Id*. at 57. Lincoln's father Thomas also showed impatience with Lincoln's reading because he needed Abraham for field work. Kaplan, *supra* n. 23, at 19-20.

116   Dirck, *supra* n. 30, at 4. Lincoln's notes about practicing law are often referred to as "Notes for a Law Lecture," but there is no record where, when, or even if Lincoln ever delivered such a lecture. *Id*. at 1.

117   Wilson, *Honor's Voice, supra* n. 26, at 106.

118   *See* Linda Edwards, *Legal Writing and Analysis* 69 (Aspen Publishers 2003).

119   *See id*. at 68 ("Your working draft is where you 'grasp the case.' It guides, deepens, and tests your analysis, and it forms your ideas into the kind of structured, linear reasoning that lawyers must master."); Richard K. Neumann, Jr. & Sheila Simon, *Legal Writing* 239 (Aspen Publishers 2008) (urging writers to start writing before finishing research because once you begin writing you will know where you need more authority).

120   Richard K. Neumann, Jr., *Legal Reasoning and Legal Writing* 65 (5th ed., Aspen Publishers 2005) (suggesting that writers allow a day or two between drafting and revising).

121   *See* Donald, *supra* n. 42, at 151.

122   *Id*.

123   Antebellum America changed "from a society of small, independent communities to a mass society ... a thousand people might hear the orator but tens of thousands would read the speech." White, *Lincoln's Greatest Speech, supra* n. 11, at 71-72. Lincoln's speeches were written for live audiences. White, *The Eloquent President, supra* n. 1, at xx.

124   Wilson, *Lincoln's Sword, supra* n. 23, at 54-55.

125   *Id*. at 54.

126   *Id*. at 55.

127   White, *The Eloquent President, supra* n. 1, at 240; Wills, *supra* n. 71, at 51. White marvels at the number of people in attendance:
There were far too many people for beds, even with the accepted custom of two and three in a bed. The American House, Eagle, and McClellan hotels, as well as all the boardinghouses, were full. Where there were no beds, people slept in hotel lobbies and boardinghouse parlors. Churches opened their doors so that people could sleep on pews. White, *The Eloquent President, supra* n. 1, at 231.

128   Wills, *supra* n. 71, at 25.

129   *See id*.

130   *Id*. at 37 (emphasis in original).

131    *Id.*

132    White, *Lincoln's Greatest Speech, supra* n. 11, at 23.

133    *See id.* at 23.

134    *Id.* at 29-30.

135    *Id.* at 24-25, 30, 32, 38-39.

136    *Id.* at 59.

137    *Id.* at 199.

138    Sorenson, *supra* n. 12, at 102.

139    Even though judges are the primary audience, many briefs are also shared with clients. *But see* Aldisert, *supra* n. 15, at 19 (noting that judges and their law clerks are the only audience).

140    Senior judges advise new judges to remember their humanness. *See* Pamela Ann Rymer, *The Trials of Judging*, 4 Green Bag 2d 57, 61 (2000) (advising new judges not to "think of yourself as any different now from what you were before, except, perhaps, that the demands of honor and civility, humility and sensitivity, are more exacting than ever").

141    *See* Edwards, *supra* n. 118, at 72 ("Judges share the characteristics of other law-trained readers. Their attention is finite. They are busy and impatient with delay in getting to the bottom line."). Judges also do not like to start reading something they cannot finish. Scalia & Garner, *supra* n. 13, at 25 (citing Susan Bell, *Improving Our Writing by Understanding How People Read Personally Addressed Household Mail*, 57 Clarity 40 (2007)).

142    *See* Michael R. Smith, *Advanced Legal Writing* 155-56 (Aspen Law & Bus. 2002). Smith calls this quality "reader empathy." The brief writer "must be sensitive to the judge's lack of familiarity with the case." *Id.* at 156.

143    Kozinski, *supra* n. 9, at 327.

144    *Leahy, Hatch, Feinstein, Schumer Introduce Bill To Increase Federal Judgeships And Help Reduce Judicial Backlogs*, http:// leahy.senate.gov/press/200803/031308c html (last accessed June 19, 2009).

145    *Id.* In an effort to make the federal judges' workload more manageable, Senator Patrick Leahy, Chairman of the Senate Judiciary Committee, introduced the "Federal Judgeship Act of 2008" on March 13, 2008, to add several permanent and temporary judges. The bill would add twelve permanent circuit court judges, thirty-eight permanent district court judges, fourteen temporary district court judges, two temporary circuit court judges; convert five existing temporary judges into permanent positions; and extend one existing temporary district court judge. Sen. 2774, 110th Cong. (Mar. 13, 2008). Chief Justice John Roberts is also leading the charge for higher federal judicial salaries. *See* Linda Greenhouse, *Chief Justice Advocates Higher Pay for Judiciary*, N.Y. Times (Jan. 1, 2007) (available at http:// www.nytimes.com/2007/01/01/us/01scotus html). Several other groups have joined the effort advocating for increased salaries for the federal judiciary including the American Bar Association, state and local bar associations, the General Counsels of several large corporations, law school deans, editorial staffs, and the American College of Trial Lawyers. Administrative Office of the U.S. Courts, *Judicial Compensation*, http:// www.uscourts.gov/judicialcompensation/ support html) (last accessed June 19, 2009).

146    Aldisert, *supra* n. 15, at 20.

147    Justice Paul H. Anderson, Assoc. J., Minn. Supreme Ct., Remarks, *Suggestions for Legal Writers* (U. of St. Thomas Sch. L., Mar. 24, 2006). Professor Mary Beth Beazley made the same observation. Remarks, *Divine Secrets of the Ha-Ha Sisterhood* (Leg. Writing Inst. 13th Biennial Conf, July 15, 2008).

148    *See supra* Part II.

149    Smith, *supra* n. 142, at 164.

150   The quote probably originated with Blaise Pascal, *The Provincial Letters*, Letter 16 (available at http://www.archive.org/details/provincialletter027613mbp) ("The present letter is a very long one, simply because I had no leisure to make it shorter."). The quote, or a variation ("If you want me to give you a two-hour presentation I am ready today. If you want only a five-minute speech, it will take me two weeks to prepare.") is sometimes attributed to Mark Twain. *See Dangerous Intersection, More Time = Shorter Letter*, http://dangerousintersection.org/?p=84 (last accessed June 19, 2009).

151   Model R. Prof. Conduct 1.3 (ABA 2004) ("A lawyer shall act with reasonable diligence and promptness in representing a client.").

152   The term "editing" often encompasses three very distinct processes: revising (looking at the big picture), editing (looking at smaller issues like sentence structure and word choice), and proofreading (looking for errors). Laurel Currie Oates & Anne Enquist, *The Legal Writing Handbook* 569-73 (4th ed., Aspen Publishers 2006).

153   In the ideal situation you will have enough time for multiple edits to address multiple problems. Neumann, *supra* n. 120, at 65.

154   *See supra* Part II.

155   *See* Neumann, *supra* n. 120, at 243 (suggesting that one cure for sing-songy sentences is to vary the type of sentence (simple, compound, or complex), the lengths of sentences (long, short, medium), and the way sentences begin (subject, prefatory word or phrase, dependent clause)); *see also* Richard C. Wydick, *Plain English for Lawyers* 38 (4th ed., Carolina Academic Press 1998) (recommending variations in sentence construction to maintain reader interest).

156   Wills, *supra* n. 71, at 157.

157   White, *Lincoln's Greatest Speech, supra* n. 11, at 165. White notes, "[A]lthough Lincoln often crafted short sentences, some of his most memorable prose was rendered in long and complex sentences." *Id*. at 166. White adds, "Lincoln's closing sentence [to the Gettysburg Address], in a speech known for its brevity, was a surprising, long, complex sentence of eighty-two words. The simplicity of Lincoln's speeches has often been oversold." White, *The Eloquent President, supra* n. 1, at 249.

158   Donald, *supra* n. 42, at 461.

159   White gives several examples of the difference between the Saxon and Latinate form of words: "herds of cows" instead of "cohorts of bovines"; "lie" instead of "prevaricate"; "stop" instead of "desist"; and "end" instead of "terminate." White, *The Eloquent President, supra* n. 1, at 254.

160   *See id*. at 254-55. Wills also notes that Lincoln, in the Gettysburg Address, often used the same word in different contexts to further his themes. Wills, *supra* n. 71, at 173-74.

161   Klein, *supra* n. 24, at 220.

162   Wydick, *supra* n. 155, at 35-39, 57-63.

163   *See* Smith, *supra* n. 142, at 164 (describing this as the trait of an intelligent and articulate legal writer). Another advantage of short sentences is that short sentences keep the verb and subject close to each other. Long sentences can be difficult to understand. Neumann, *supra* n. 120, at 242 ("[Unnecessarily long sentences] obscure meaning. If a sentence is too long to be understood on the first reading, express the sentence's idea in fewer words, or split the sentence into two (or more) shorter sentences, or do both.").

164   *See supra* Part IV.A (Lincoln's modifications to the First Inaugural after Seward's editing suggestions).

165   Wilson, *Lincoln's Sword, supra* n. 23, at 8.

166   Lincoln, of course, drafted his speeches in longhand. Donald, *supra* n. 42, at 238.

167    Richard Neumann advises, "Do not be afraid to ax material from your first draft. The fact that you have written something does not mean you have to keep it." Neumann, *supra* n. 120, at 65. Laurel Currie Oates and Anne Enquist add, "Don't let yourself fall in love with a particular phrase or sentence." Oates & Enquist, *supra* n. 152, at 572.

168    White, *The Eloquent President, supra* n. 1, at 307.

169    Webster's defines "rhetoric" as "the art of effectively using language." *Webster's American Dictionary, supra* n. 5, at 675. Some people understand "rhetoric" in a negative way to mean the use of exaggerated language. I use the word "rhetoric" with only its positive connotations.

170    *See* Wilson, *Lincoln's Sword, supra* n. 23, at 9.

171    *Id.* at 9 (citing John G. Nicolay and John Hay, *Abraham Lincoln: A History* vol. 10, 351 (Century Co. 1904)).

172    Michael Pollan developed a seven-word mantra about healthy eating, "Eat food. Not too much. Mostly plants," which inspired this seven-word mantra for legal writing. Michael Pollan, *In Defense of Food* 1 (Penguin Press 2008).

6 JALWD 28

---

**End of Document** <span style="float:right">© 2014 Thomson Reuters. No claim to original U.S. Government Works.</span>